## THE GEMMA.

(District Court, D. Rhode Island. May 22, 1926.)

### No. 1592.

Customs duties ⊂⊃130—British vessel held subject to forfeiture for attempting to leave without reporting and for unlawfully unlading merchandise (Tariff Act 1922, tit. 4, §§ 585, 586 [Comp. St. Ann. Supp. 1923, §§ 5841h4, 5841h5]).

Evidence *held* to sustain a libel for forfeiture of a British vessel for violation of Tariff Act 1922, tit. 4, §§ 585, 586 (Comp. St. Ann. Supp. 1923, §§ 5841h4, 5841h5), by attempting to depart from a collection district without making a report or entry, and for unlading merchandise within the United States and its waters before coming to a proper place for discharge and without a permit.

In Admiralty. Libel of information by the United States against the British steam screw Gemma. Decree of forfeiture.

John S. Murdock, U. S. Atty., and Fred B. Perkins, Asst. U. S. Atty., both of Providence, R. I., for the United States.

Daniel T. Hagan and Chas. A. Kiernan, both of Providence, R. I., opposed.

BROWN, District Judge. This is a libel of information against the British steam screw Gemma, praying condemnation and forfeiture for violations of the customs laws of the United States.

The Gemma had a certificate of British registry, issued at Montreal, P. Q., Canada, on the 7th day of July, 1922. She is 135.6 feet in length and 321.44 gross tonnage.

Coast Guard patrol boat No. 231 was at anchor on the night of January 6, 1926, in the Sakonnet river, about midstream, opposite Black Point and approximately 5 miles northerly from Sakonnet Light. At 5:50 a. m., January 7th, her commanding officer, Roy L. Raney, came on deck, smelled the odor of coal smoke, and observed a vessel without lights going down stream near the west shore at a speed of about 7 or 8 knots. The patrol boat No. 231 followed and overtook her about abeam of the Sakonnet Light. The vessel, which was headed out to sea, proved to be the Gemma, and was turned around about a mile and a half below the Sakonnet Light and escorted back into the Sakonnet River, where she was boarded by Mr. Raney and Boatswain's Mate Baker. In her hold was found no cargo, but several empty cases, bunches of straw, broken bottles, an unloading chute, and general disorder in the hold. A small quantity of liquor was found in one bottle.

Upon request for his papers, the only papers produced by the master of the Gemma, J. G. Bowers, were the certificate of registry and a shipping agreement with the crew, though the request was specifically for his clearance papers and for a manifest for his cargo. A copy of a newspaper, the Halifax Herald, of Friday, January 1, 1926, was found on the Gemma. The Gemma was seized and subsequently turned over to the collector of customs at Providence.

The libel assigns four causes for forfeiture:

First, for violation of section 586, title 4, Tariff Act of 1922 (C. S. Ann. Supp. 1923, § 5841h5), for unlawful unlading of 2,050 packages of intoxicating liquor on or about May 19, 1925, at a point about two miles off Bass Harbor, Me.

A second cause under the same statute, for unlawfully unlading 600 packages of intoxicating liquor on or about September 6, 1925, at a point about two miles from Searsport, Me.

A third cause of forfeiture under the same statute, for unlawfully unlading 1,640 cases of assorted liquors and 256 kegs of malt on January 7, 1926, in the Sakonnet river in this district.

A fourth cause of forfeiture under section 585, title 4, Tariff Act of 1922 (C. S. Ann. Supp. 1923, § 5841h4), for an attempt to depart from the collection district without making a report.

It is conceded by the United States that it had no evidence sufficient to sustain the third cause of forfeiture. The United States offered testimony first as to the fourth cause of forfeiture, under section 585 of the Tariff Act of 1922, 42 Stat. 980 (C. S. § 5841h4):

"*Departure before Report or Entry.*—If any vessel or vehicle from a foreign port or place arrives within the limits of any collection district and departs or attempts to depart, except from stress of weather or other necessity, without making a report or entry under the provisions of this act, or if any merchandise is unladen therefrom before such report or entry, the master of such vessel shall be liable to a penalty of $5,000, and the person in charge of such vehicle shall be liable to a penalty of $500, and any such vessel or vehicle shall be subject to forfeiture, and any customs or Coast Guard officer may cause such vessel or vehicle to be arrested and brought back to the most convenient port of the United States."

In the absence of papers taken from the vessel as to clearance and cargo, the United States offered documentary evidence of clearance from the port of Yarmouth, N. S., for the port of Havana, Cuba, December 31, 1925, with a cargo of 1,640 cases of assorted liquors and 256 kegs of malt. The evidence shows that the Gemma was not in the Sakonnet river below the first bridge on the afternoon of January 6th. It is evident that the Gemma was a vessel from a foreign port, which had arrived within the limits of collection district No. 5.

The answer admits the arrival of the Gemma on January 7th within the limits of the collection district of Rhode Island, but asserts that no opportunity was given to the master to report his arrival, and that, before said master could report the arrival of the vessel, said vessel was seized and the master and crew placed under arrest. This admission in the answer dispenses with any

necessity for the United States to offer evidence that the master did not report his arrival.

It is apparent that, between the time of her clearance and her seizure, the Gemma had disposed of a large cargo of intoxicating liquor; but it is impossible upon the evidence to say whether this was disposed of outside of our territorial waters or at some point on the Sakonnet river. That there was a departure from her voyage to Havana, Cuba, is apparent, and her movements are inconsistent with an intention to report her arrival or departure. Had she completed her unlading on the high seas, or even at a point off shore within our waters, there was no apparent occasion for her entry into the Sakonnet river. A fog had prevailed for several days and her entry into the Sakonnet river after the time the No. 231 anchored is more consistent with the view that she had unladen at some point on the shore during the brief period of her stay than that she came in without a cargo. She came in and departed, without any intention to report her arrival or departure, voluntarily, and not from stress of weather or other necessity.

I find that there was probable cause for her seizure.

### The Second Cause of Forfeiture.

The United States offered documentary evidence to show that the Gemma cleared from Yarmouth, N. S., on September 5, 1925, with a cargo of 600 kegs of whisky, bound for Gran Cay. On Sunday night, September 6, 1925, between 10 and 11 o'clock, a vessel arrived at Kidder's Wharf, one-half mile from Searsport, Me., tied to the wharf, and remained there until 2 o'clock on the morning of Labor Day, September 7, 1925, when it departed. There were no lights on the vessel, and a large cargo consisting of kegs, barrels and boxes was unloaded. Three freight cars were on the rails at the wharf. There is but one railroad from Kidder's to Searsport—the Northern Maine Junction, about 30 miles away. At this junction, about 10 o'clock on the evening of September 7th, there were seized by Sheriff Farrar, Penobscot county, Me., and local officers, two carloads of liquor, and at Newport, 20 miles farther on, another carload. These cars were identified as the same cars which departed from Searsport on the morning of the same day at 7 o'clock. They contained 594 barrels and kegs, being 6 in number less than that shown in the clearance

of the Gemma from Yarmouth two days previous.

On the heads of many barrels were the marks, "In Transit Georgetown via Gemma." Analysis showed the contents of one of these barrels to be Scotch whisky containing 60.25 per cent. of alcohol by volume.

James Amero, of Bangor, a marine engineer, was working on the tug Betsy Ross, tied up at the wharf at Kidder's Point, the nights of September 6th and 7th. He heard noises on the wharf, and, going with a lantern to find the boat, he was told by several men to put his lantern out. The vessel which came in had no lights. She unloaded her cargo of barrels and kegs, which were loaded in three freight cars and departed at about 2 the next morning. He testified that he sat upon the rail of the vessel, and from there looked into the engine room and talked with some of the crew; that the vessel was 100 feet or so in length, a steel ship painted black; that it was the same boat pointed out to him in Narragansett Bay on the morning of the trial. He identified the vessel by a dent in her side, by the location of her washroom forward of the engine plant, and by a similarity of the engine.

William Sholes, of Rockport, testified he was engineer of the Betsy Ross; that he was at Kidder's Wharf and went to the vessel; that she was not equipped for fishing; that he was satisfied in his own mind that it was the same vessel he had pointed out to him at the dock in Providence on the morning of the trial, but would not swear positively it was the same vessel.

I am of the opinion that the proof is sufficient to show an unlawful unlading and a cause of forfeiture under section 586 of the Tariff Act of 1922 (Comp. St. Ann. Supp. 1923, § 5841h5).

### The First Cause of Forfeiture.

I find that the Gemma cleared from Halifax, N. S., on May 16, 1925, bound for Havana, via San Pierre, Miq., with a cargo of 2,000 cases of ale, 1,000 cases of stout, and 1,100 cases of whisky.

The American steamship Van, at that time belonging to the Maine Coast & Canada Steamship Company, plying between Jonesport, Me., and Boston, at 5 o'clock on the evening of May 18, 1925, left Bass Harbor, Me., and went out to sea. At about 10 or 11 o'clock on the night of the 18th, another vessel met the Van, and the two proceeded into the lee of Long Island, off the coast of Maine, and were tied together. The vessel

which had approached the Van was a beam trawler and had on her stern the name Gemma. After being tied together at a point 3 or 4 miles off Long Island, the two vessels jogged out to sea at a speed of 1 or 2 miles an hour. Transfer of cargo from the Gemma to the Van continued until about 2 or 3 o'clock in the morning of the 19th, when the two vessels separated. The vessels were together 3 or 4 hours, and for the major part of this time at least were within the 12-mile limit.

When the Van arrived in Boston, her cargo was unloaded and many cases were seized, some being marked "Brunswick brand pickled herring," and under blue paint appeared the marking "B. J. Michelon, Steamship Gemma, Halifax." 656 cases of Scotch whisky were also seized.

I am of the opinion that the United States has shown a transfer within 12 miles from shore of a substantial amount of the cargo of the Gemma.

Though the claimant questions the sufficiency of the evidence to identify the Gemma as the vessel that landed her cargo at Kidder's Wharf and that transferred a cargo to the steamship Van, I am of the opinion that there is competent and sufficient evidence to sustain the libel as to each of these transactions. No evidence was offered by the claimants as to any of the causes of forfeiture assigned in the libel; the claimant relying solely upon its argument that the proofs offered in support of the libel are insufficient. I am of the opinion that the United States is entitled to a decree of forfeiture for the first, second, and fourth causes alleged in the libel.

A draft decree may be presented accordingly.